UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| VINCENT CRAIG OLSEN,<br><br>                Petitioner,<br><br>v.<br><br>TIMOTHY WENGLER, Warden;<br>STATE OF IDAHO; WARDEN<br>JOHANNA SMITH;<br><br>              Respondents. | Case No. 1:09-CV-00081-EJL<br><br>**MEMORANDUM DECISION AND ORDER** |

Pending before the Court in this habeas corpus case is a Motion for Summary Judgment filed by Respondent Tim Wengler (Respondent). (Dkt. 42.) Petitioner Vincent Olsen (Petitioner) has filed his Response. (Dkt. 52.) Having reviewed the record, including the state court record, the Court finds that the decisional process would not be aided by oral argument. Having considered the arguments of the parties, the Court enters the following Order granting the Motion for Summary Judgment and dismissing the Petition for Writ of Habeas Corpus with Prejudice.

## BACKGROUND

Petitioner, a college engineering student, attended a party where he and another college student he had never met, Cameron Davis ("Davis"), had a confrontation, which ended in Petitioner shooting and killing Davis. Petitioner was later charged by indictment

with second degree murder and possession of a deadly weapon in the commission of a felony. (State's Lodging C-1, p. 155.) Petitioner is an "atypical" defendant--from an affluent family, extremely intelligent, well-educated, articulate, and active and interested in the defense of his case. (State's Lodging C-1, p. 155, state court findings of fact on post-conviction review).

Cameron Davis, the victim, was the son of Idaho Senate Majority Leader Bart Davis. There was immediate and continuing media coverage about the case. (See State's Lodging C-9.)

Petitioner hired "experienced and capable trial attorneys" Mark and David Manweiler to represent him. (See State's Lodging C-1, p. 155, state court findings of fact on post-conviction review.) Mark Manweiler was lead counsel, while David Manweiler was second chair counsel. (State's Lodging C-2, pp.5-51.)

Petitioner asserted that the killing was a combination of self-defense and mistake. Prior to trial, Petitioner entered an *Alford* plea and, as a result, was convicted of one count of voluntary manslaughter and a weapon enhancement. He was sentenced to ten years fixed, with fifteen years indeterminate by Idaho District Judge James Judd. Judgment was entered on December 4, 2003. (State's Lodging A-1, pp. 82-84.) Thereafter, Petitioner filed a Rule 35 motion for reduction of sentence, which was denied by Judge Judd.

Petitioner filed a state post-conviction action alleging, among other claims, many claims of ineffective assistance of counsel. Ada County Public Defender Jonathan Loschi was appointed to represent Petitioner in the post-conviction action, and Loschi filed an

amended post-conviction application on Petitioner's behalf. All but three claims were summarily dismissed. (State's Lodging C-14.) State District Judge Joel Horton held an evidentiary hearing on Petitioner's three remaining claims: that counsel failed to advise him of the elements of the crime, that counsel failed to file a motion to withdraw the guilty plea, and that counsel failed to consult with Petitioner about an appeal of the denial of the Rule 35 motion. The court denied relief on the first two claims, but granted partial relief on the third, entering a new order denying Petitioner's Rule 35 motion for reduction of sentence that permitted Petitioner's appeal time to start again. (State's Lodging D-6, pp. 1-2; A-1, pp. 107-110.)

Petitioner appealed the portion of the state court's order denying him relief. Petitioner presented seven issues on appeal before the Idaho Court of Appeals, and, after dismissal was affirmed, Petitioner presented only five issues in his petition for review before the Idaho Supreme Court. (State's Lodgings D-6 through 11.)

As a result of obtaining partial relief in the post-conviction action, Petitioner took advantage of the re-opened appeal time period and raised a claim that the trial court erred in denying his Rule 35 motion for reduction of sentence. The Idaho Court of Appeals affirmed denial of the motion. Petitioner filed a petition for review, which was denied by the Idaho Supreme Court. (State's Lodgings B-1 through B-8.)

Petitioner filed a second Rule 35 motion, this time to correct an illegal sentence. The motion was denied. (State's Lodging E-1.) Petitioner also filed a motion to withdraw his guilty plea under Rule 33, arguing that the plea agreement had been breached by the

State, the plea was rendered involuntary when the State requested restitution, the prosecution's witnesses lied to police and the grand jury, and Sarah Moriarity had changed her testimony at sentencing. (State's Lodging E-1.) The state district court denied the motion for lack of jurisdiction. Petitioner appealed denial of both motions, and the Idaho Court of Appeals affirmed denial. Petitioner filed a petition for review with the Idaho Supreme Court, which was denied. (State's Lodgings F-1 through F-7.)

Petitioner filed this federal habeas corpus action on February 25, 2009. (Dkt. 1.) Respondent filed a Motion for Partial Summary Dismissal, and, as a result, this Court dismissed Claims 3, 4, 5, 6, 8, 9, 11, 12, 13, 16, 17, 18, 19, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, and 31 on procedural default grounds. The Court permitted Petitioner to proceed to the merits of Claims 1, 2, 7, 10, 14, 15, 20, and 32. Respondent now asserts entitlement to summary judgment on the remaining claims.

## MOTION FOR SUMMARY JUDGMENT

**1.      Standard of Law Governing Summary Judgment**

Summary judgment is appropriate where a party can show that, as to any claim or defense, there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(1)(a). The Federal Rules of Civil Procedure apply to habeas corpus actions except where application of the rules would be inconsistent with established habeas practice and procedure. Rule 11, Rules Governing Section 2254 Cases. Accordingly, summary judgment motions are appropriate in habeas corpus proceedings where there are no genuine issues of material fact and the moving

party is entitled to judgment as a matter of law. *Blackledge v. Allison*, 431 U.S. 63, 80-81 (1977).

Under the Anti-terrorism and Effective Death Penalty Act (AEDPA), the Court cannot grant habeas relief on any federal claim that the state court adjudicated on the merits unless the adjudication of the claim:

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

Section 2254(d)(1) has two clauses, each with independent meaning. For a decision to be "contrary to" clearly established federal law, the petitioner must establish that the state court applied "a rule of law different from the governing law set forth in United States Supreme Court precedent, or that the state court confronted a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrived at a result different from the Court's precedent." *Williams v. Taylor*, 529 U.S. 362, 404-06 (2000).

To satisfy the "unreasonable application" clause, the petitioner must show that the state court was "unreasonable in applying the governing legal principle to the facts of the case." *Williams*, 529 U.S. at 413. A federal court cannot grant relief simply because it concludes in its independent judgment that the decision is incorrect or wrong; the state

court's application of federal law must be objectively unreasonable. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Bell v. Cone*, 535 U.S. 685, 694 (2002). The state court need not cite or even be aware of the controlling United States Supreme Court decision to be entitled to AEDPA deference. *Early v. Packer*, 537 U.S. 3, 8 (2002).

To be eligible for relief under § 2254(d)(2), the petitioner must show that the decision was based upon factual determinations that were "unreasonable in light of the evidence presented in the State court proceeding." *Id.*

Under all circumstances, state court findings of fact are presumed to be correct, and the petitioner has the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## 2.    Evidence Not Presented in State Court Hearings

Before turning to the substantive claims, the Courts finds it necessary to clarify the evidence Petitioner may and may not rely upon in a federal habeas corpus proceeding. Congress has mandated strict rules governing new evidence in federal habeas corpus proceedings. As a result, when a party points to a "genuine dispute of material fact," he must point to evidence that was brought before the state courts, or he must meet a high threshold to bring forward new evidence in habeas proceedings.

If a petitioner wishes to bring new evidence on federal habeas review that has not been presented to the state courts, *and* he failed to develop the factual basis of the claims in state court because of "lack of diligence or some greater fault, attributable to" him or his counsel, then he must meet the requirements of § 2254(e)(2). *Williams v. Taylor*, 529

U.S. 420, 432 (2000). If he is not at fault for failing to present the evidence to the state courts, he can present the evidence on federal habeas corpus review without meeting the requirements of § 2254(e)(2). *Holland v. Jackson*, 542 U.S. 649, 652-53 (2004).

Section 2254(e)(2) requires that a petitioner show that his claims are based either on a new retroactive rule of constitutional law or on a factual predicate that could not have been previously discovered through the exercise of due diligence, *and* that "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for the constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." *See* § 2254(e)(2)(A)&(B).

Petitioner was afforded an evidentiary hearing on three of his claims. However, on his remaining claims, he did not present enough facts in his amended post-conviction application to warrant an evidentiary hearing. The Idaho post-conviction statute requires that the petitioner attach or provide admissible evidence with his petition in order to survive summary dismissal. *See* Idaho Code § 19-4903. The Court concludes that the state court's summary dismissal of Petitioner's speculative claims without further development of the record was well within the statutory guidelines given that Petitioner has not shown any new evidence was not accessible to him or his counsel.

The record reflects that Petitioner disagreed with his appointed counsel, Jonathan Loschi, as to how many claims to include in the amended post-conviction application, and what needed to be done to investigate the case. Petitioner wanted to include 42 claims, spanning 200 pages, but counsel disagreed. (State's Lodging C-3, p. 21.) The state district

court held a hearing on Petitioner's motion for appointment of new counsel, taking testimony from Petitioner and his counsel. At that hearing, Petitioner's counsel went over his extensive efforts at obtaining and reviewing transcripts and case files, including the files of Petitioner's trial counsel. Petitioner's post-conviction counsel stated:

> As far as investigating the case, we are not going to start from scratch and reinvestigate the case. If he has allegations that there is newly discovered evidence, and there are a few people that it is easy enough for our office to make calls to and attempt to interview to either dispel or affirm that, and my investigator is going to do that. I never told him we wouldn't do it. It was just that [the investigator is] prioritizing his workload, and he would do it when he was able to do it.

(State's Lodging C-3, p. 26.) At the end of the hearing, the Court stated that there was no legal or factual basis to grant Petitioner a new attorney, but it gave Petitioner the option of keeping Mr. Loschi as counsel or representing himself in the post-conviction case. Petitioner chose to remain with the same counsel rather than represent himself. (*Id*., pp. 32-334.)

After an investigation, Petitioner's counsel eventually concluded that there was no newly discovered evidence to support Petitioner's claims or to serve as the basis for a stand-alone claim of "newly discovered evidence." The state district court noted:

> Petitioner's post-conviction relief counsel candidly informs the Court that he "has retained an investigator to review the matter, but no new evidence has been found." *Brief in Support of Amended Petition for Post-Conviction Relief*, p. 15. As there is no allegation of newly discovered evidence, summary dismissal of this claim is warranted.

(State's Lodging C-14, p. 29.)

Generally, Petitioner bears the consequences of his post-conviction counsel's decisions regarding discovery. *Williams v. Taylor*, 529 U.S. 420, 436, 439-40 (2000) ("Counsel's failure to investigate these references in anything but a cursory manner triggers the opening clause of § 2254(e)(2)."). This is not to say that, here, Petitioner's counsel failed to investigate the case; rather, it is to say that counsel represented that he employed an investigator who conducted an investigation, and the investigation turned up no new evidence. Petitioner himself has not brought forward any new evidence that he found on his own volition or that counsel left undone.

It does not appear that the state district court or the prosecutor acted in a manner to prohibit or prevent Petitioner from obtaining or bringing forward evidence in state district court. Rather, it appears that there was no more evidence to be had. Petitioner did not seek an evidentiary hearing in his amended petition. (State's Lodging C-1, pp. 77-82.) Petitioner's counsel asked for an evidentiary hearing on the failure-to-appeal issues at oral argument on the motion to dismiss (which resulted in a partial grant of the post-conviction application regarding the Rule 35 appeal ). (State's Lodging C-2, p. 40.) Petitioner did not make an attempt to expand the scope of the evidentiary hearing from three claims to more, and, importantly, did not bring forward any adequate reason showing that the hearing should be expanded to include any of the summarily-dismissed claims on the grounds that additional evidence existed.

Accordingly, the Court concludes that Petitioner is barred by § 2254(e)(2) from bringing new evidence on federal habeas corpus review. Hence, his Affidavit supporting his Objection to Respondent's Motion for Summary Judgment shall be considered argument only; to the extent that facts in the Affidavit conflict with facts in the record, the Affidavit must be disregarded. (Dkt. 52-2.)

**3.     Discussion of Claim 1**

Claim 1 is that trial counsel, Mark and David Manweiler, were ineffective for not investigating false statements and perjured grand jury testimony of state witnesses Brent Leonard and Sarah Moriarity. Petitioner alleges that if he had known that these witnesses were colluding by not being truthful to investigators and to the grand jury, Petitioner would not have pleaded guilty, but would have proceeded to trial.

The nature of the collusion is as follows. After the killing, the victim's friend, eyewitness Brent Leonard ("Leonard"), told eyewitness Sarah Moriarity ("Moriarity") that he was not going to disclose to police that he had seen Davis punch Petitioner in the face. Leonard asked Moriarity not to disclose to investigators the fact that she had seen the punch.

Neither Leonard nor Moriarity told the police or defense investigators about the punch. Trial counsel's defense investigator, James Weaver, interviewed Leonard at length before Petitioner pleaded guilty. (State's Lodgings A-2, Ex. BBB, pp. 1-32.) During that

interview, Leonard failed to divulge that he had seen Davis punch Petitioner. (State's Lodging A-2, Def. Ex. BBB, p. 1-32.)

At the grand jury hearing, Leonard testified to the grand jury that he did not see Davis punch Petitioner, but Moriarity testified that she had seen the punch. Petitioner then pled guilty.

At sentencing, Moriarity testified for the first time that she had "lied" to law enforcement officers and to a defense investigator by not disclosing the punch. Also at that hearing, she testified for the first time that Leonard had informed her that he was not going to tell police about the punch and had asked her to do likewise. (State's Lodging C-6, pp. 330-40.)

The law is clearly established that a criminal defendant has a constitutional right to the assistance of counsel under the Sixth Amendment, made applicable to the states by the Fourteenth Amendment. *Gideon v. Wainwright*, 372 U.S. 335 (1963). In *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court established the proper test to be applied to claims alleging constitutionally inadequate representation. To succeed on such a claim, a petitioner must show that (1) counsel's performance was deficient in that it fell below an objective standard of reasonableness and that (2) the petitioner was prejudiced thereby. *Id*. at 684. Prejudice under these circumstances means that there is a reasonable probability that, but for counsel's errors, the result of the

proceeding would have been different. *Id*. at 684, 694. A reasonable probability is one sufficient to undermine confidence in the outcome. *Id*. at 694.

The *Strickland* test applies to challenges to guilty pleas based on ineffective assistance of counsel claims. *Hill v. Lockhart*, 474 U.S. 52, 58 (1985). Under *Hill*, a defendant must also show there is a reasonable probability that he would not have pled guilty but for counsel's erroneous advice. *Id.* at 59.

On post-conviction review, the district court stated that Petitioner failed to specifically identify how trial counsels' performance was deficient. (State's Lodging C-14, p. 23.) No evidence in the record before the district court showed that "Leonard solicited, whether successfully or not, Robert Waller or Paul Leonard to make false or misleading statements to investigators." (*Id.*, p. 22.) In addition, the district court found that nothing in the record supported Petitioner's argument that had Leonard been reinterviewed, he would have admitted to the collusion to the defense team, especially because the object of the collusion was to place the victim in a better light. The state district court summarily dismissed the claim because it could find no act or omission of counsel that was deficient performance regarding failure to interview witnesses. (*Id.*)

On appeal of Petitioner's post-conviction matter, the Idaho Court of Appeals found that Olsen's trial counsel had interviewed Moriarity after the grand jury hearing and that Moriarity had lied (by omission) during that interview. The Idaho Court of Appeals found

that the record did not reflect whether trial counsel had interviewed Leonard.[1] (State's

Lodging D-6, p. 8; State's Lodgings A-2, Def. Ex. ZZ; C-14, p. 23.)

On these facts, the Idaho Court of Appeals determined:

> [A]s the district court held, "it is improbable that a person who
> willfully lied to police officers and perjured himself before a grand jury
> with the goal of concealing negative information about the decedent would
> voluntarily admit such conduct to the defense team." The district court
> found that Olsen had failed to specifically allege how trial counsel's
> performance was deficient. We conclude that, under the facts of this case,
> Olsen's trial counsel was not ineffective for failing to reinterview the
> witnesses. At least one had lied in a previous interview, and Olsen claimed
> that he knew they were lying. Thus, reinterviewing these witnesses in order
> to ascertain that they were lying would not foreseeably produce significant
> new evidence for the defense. Therefore, the district court did not err in
> summarily dismissing this allegation.

(State's Lodging D-6, p. 8.)

Petitioner argues that the state courts unreasonably determined the facts. To be

eligible for relief under § 2254(d)(2), he must show that the decision was based upon

factual determinations that were "unreasonable in light of the evidence presented in the

State court proceeding." *Id*. State court findings of fact are presumed to be correct, and

the petitioner has the burden of rebutting this presumption by clear and convincing

evidence. 28 U.S.C. § 2254(e)(1).

Petitioner argues that the state courts "erred in ruling that the witnesses would not

have revealed to the defense that they had agreed to lie if counsel had investigated the

---

[1] However, defense team investigator James Weaver had interviewed Brent Leonard
before. (State's Exhibit A-2, Exhibit BBB.)

false statements." (Petitioner's Objection, p. 5, Dkt. 52.) Petitioner supports his argument with speculation as to what the witnesses might have said and why. While the witnesses may have said and done what Petitioner believes, they also may have said and done otherwise. Contrary to Petitioner's speculation, Moriarity may have omitted facts she knew only when she was not under oath, and Leonard may have lied whether he was under oath or not (which is what each witness actually did). The point is that only speculation exists, because Petitioner did not bring forward additional evidence from Moriarity, Brent Leonard, Paul Leonard, or Robert Waller. In short, Petitioner has not met by clear and convincing evidence his burden to show that the state court factfinding was in error.

Petitioner also argues that the state courts were wrong in finding that no significant evidence would have come from reinterviewing the witnesses. Again, Petitioner merely speculates that there was some grander collusion among all the witnesses, but he produced no proof to support his theory.

On the point of whether reinterviews would have yielded enough evidence for Petitioner to decide to proceed to trial rather than settle for a plea bargain, Respondent persuasively argues that Petitioner already had sufficient information in his possession to prove that Davis punched Petitioner, including: (1) a witness statement from Paul Leonard (Brent Leonard' brother), which included testimony that Davis had punched Petitioner; (2) a witness statement from Robert Waller, indicating that Davis had punched

Petitioner; and (3) the grand jury testimony from Moriarity that Davis had punched Petitioner. In addition, after Moriarity's grand jury testimony contradicted her prior statements to investigators about the punch, Petitioner had impeachment evidence against her. Respondent argues, "Prior to his plea, Olsen only lacked the ability to directly impeach Leonard's credibility about a fact Olsen could clearly establish–the punch by Davis–and his unsuccessful effort to get Moriarity to help him conceal that fact." (Respondent's Memorandum, p. 9, Dkt. 42-1.)

Because Respondent's argument is based upon the facts in the record, and Petitioner's is based upon mere speculation, this Court agrees that Petitioner's counsel had little more to gain from reinterviewing Leonard that would have informed Petitioner's decision to plead guilty or proceed to trial. It is merely speculative to posit that Leonard would have decided to tell the truth in a second interview, especially after he lied under oath to the grand jury.

Petitioner also argues that the state district court was in error in determining that Petitioner's claim was ambiguous or unclear. Regardless of the state district court's conclusory statement that "the Court is unable to discern the act or omission that Petitioner asserts was deficient performance," it appears that the state district court did identify, analyze, and reject Petitioner's ineffective assistance of counsel claim for lack of a showing of deficient performance and prejudice.

Here, whether on deferential AEDPA review or de novo review under *Strickland*, the Court concludes that Petitioner has failed to show either deficient performance or prejudice from the alleged error of counsel. Based on all of the foregoing, the Court concludes that the Idaho Court of Appeals' decision is not contrary to, or an unreasonable application of, *Strickland* based on the evidence in the record. As a result, habeas corpus relief is not warranted.

**4.      Discussion of Claim 2**

Claim 2 is that Petitioner's two trial counsel were ineffective for failing to move to withdraw the guilty plea during sentencing on the ground that Leonard and Moriarity had lied. Petitioner alleged that he specifically asked his counsel to move to withdraw the guilty plea, but counsel did not follow his instructions.

This claim was not summarily dismissed by the state district court, and Petitioner presented evidence to support the claim at his evidentiary hearing. The Idaho Court of Appeals summarized the evidence, the district court's findings of facts and conclusions, and its own conclusions on this claim as follows:

> At the [post-conviction] evidentiary hearing, Olsen testified that he requested trial counsel to withdraw his guilty plea after learning of the inaccuracies in several witnesses' testimonies. Olsen's trial counsel testified that he and co-counsel met with Olsen after learning of the false testimony and advised him as to the effect that this discovery could have to "negate" the indictment. Trial counsel testified that he would have filed a motion had Olsen requested it. Co-counsel also testified that he was never instructed to move to withdraw the plea and that, if he was asked to do so, he would have counseled against it but done so anyway. Olsen provided no notes or other documentation that he made such a request. Based on the conflicting

> testimony, the district court found that, while a motion to withdraw his
> guilty plea was likely to have succeeded, Olsen never requested that counsel
> file such a motion. Based on our review of the record, we conclude that
> Olsen failed to meet his evidentiary burden of proving that he requested that
> trial counsel file a motion to withdraw his guilty plea.

(State's Lodging D-6, p. 11.)

Petitioner's current claim goes to the fact-finding of the district court at the post-conviction evidentiary hearing. In federal habeas proceedings, state court findings of fact are presumed to be correct, and the petitioner has the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). To be eligible for relief under § 2254(d)(2), Petitioner must show that the decision was based upon factual determinations that were unreasonable in light of the evidence presented in the State court proceeding.

Mark Manweiler, lead counsel, testified that, during a break in the sentencing hearing, he spoke with Petitioner about whether Brent Leonard could be charged with perjury. Mark did not recall any discussions about withdrawing the plea. (State's Lodging C-2, pp. 210-11.) Mark specifically testified: "I know for a fact Vince never instructed me to withdraw his plea." (*Id*., p. 185.)

David Manweiler, second chair counsel, testified that Petitioner never asked counsel to file a motion to withdraw the guilty plea. (*Id*., pp. 232-33.) David Manweiler testified that  counsel discussed with Petitioner whether Moriarity and Leonard could be charged with perjury, and the effect on the indictment, but they did not discuss

**MEMORANDUM DECISION AND ORDER - 17**

withdrawing the plea. In counsel's opinion, the testimony did not change his view of the prosecution's case. (*Id.*, p. 234.)

David Manweiler also testified that if Petitioner had asked for legal advice on whether to withdraw the plea, he would have offered this advice:

> I would have told him that the standard is different to withdraw a plea before, as opposed to after, sentencing. And it's a higher standard after sentencing. So I would have told him, "If you want to do it, now is the time. Don't wait until afterwards."

> Whether I would have advised him to do it, I would not have recommended he do it, just based upon what happened during Moriarity's testimony. I didn't think there was sufficient grounds to do it. But if he had asked, and if I would have understood him to ask for that relief, I certainly would have at least A, communicated it with Mark if he wasn't there; and B, I'm confident we would have made a motion at that time, or a request.

(State's Lodging C-2, pp. 234-35.)

A note from Petitioner that was written on David Manweiler's notepad during the sentencing hearing was produced at the evidentiary hearing that said, "Would Sarah and Brent's perjury negate the indictment and Alford plea?" (State's Lodging C-2, p. 242.) This note supports David Manweiler's testimony that the topic was discussed, but it does not show that Petitioner asked for the plea to be withdrawn.

David Manweiler also testified that Petitioner may have notified him of his request to withdraw the plea and counsel misunderstood him:

> I don't remember having a conversation about the withdraw of guilty plea. We certainly could have had discussions about the impact. And maybe that is the rub, whether I misunderstood him or not. I don't know. I don't

have a specific recollection if we talked about his plea or not. I do not believe we talked about withdrawing it. That is all I can recall.

(State's Lodging C-2, p. 243.)

Petitioner testified at the evidentiary hearing that he accepted the plea bargain to reduce the risk of exposure to a second degree murder conviction and a longer possible sentence. (State's Lodging C-2, p. 132.) Petitioner also testified that during the break in the sentencing hearing after hearing Moriarity's new statements, the following occurred:

> First I asked Mr. Mark Manweiler if Sarah Moriarty and Brent Leonard had committed perjury during the grand jury hearing. And he told me that he wasn't sure if they had. And I said, "Well, they definitely lied to the police and investigators, though." And he said yes.
>
> And then I asked him, "Well doesn't that mean that I could take back my guilty plea, and maybe even have the indictment dismissed?"
>
> And he shook his head no at that point and said, "Absolutely not. This is the sentencing hearing, and it's too late for any of that."
>
> And then he walked back into the courtroom, and we didn't discuss it any more at that point.

(*Id.*, pp. 97-98.) Petitioner further testified that he never said the words, "withdraw my guilty plea, but he said, "take back my guilty plea," because he didn't know the correct words to use. (*Id.*, p. 94-95.)

Based on the foregoing, and the remainder of the record, the Court concludes that Petitioner has not met his burden of showing that the state courts' findings of fact are unreasonable in light of the evidence presented. Both of the Manweiler brothers were experienced criminal law attorneys. Both would have known the basic principles David

testified to–that if a plea is to be withdrawn, it is better done before the sentence is pronounced, or the defendant runs the risk of simply appearing to have "buyer's remorse," once he knows the sentence. As discussed above, the collusion factor was not likely to impact much in the case, other than Brent Leonard's credibility, given that Moriarity's testimony was fairly consistent with other witnesses' testimony.

In addition, Petitioner did not get sentenced that day, which means that counsel would have had overnight to rethink and research the decision whether to withdraw the guilty plea, if it, in fact, Petitioner had broached the subject the day before. The state district court also had the opportunity to carefully consider the demeanor of the Manweilers and of Petitioner when testifying, which informed the court's decision about the credibility of each. The court particularly noted that Petitioner was not credible and that while Mark Manweiler could not remember if the topic was discussed, he knew that Petitioner had not requested him to withdraw the guilty plea. (State's Lodging C-1, p. 156 n.1; 158.) The district court's credibility determination, made in favor of the attorneys, is consistent with the evidence presented.

As a result of the foregoing, Petitioner is not entitled to habeas corpus relief on this claim. The decision of the Idaho Court of Appeals is not contrary to, or an unreasonable application of *Strickland*, because no deficient performance occurred. Neither is the decision based on an unreasonable determination of the facts in light of the evidence presented to the state courts.

**5.      Discussion of Claim 7**

Claim 7 is that trial counsel were ineffective for failing to inform Petitioner of the direct consequences of restitution that accompanied a plea of guilty. Petitioner argues that he would not have agreed to anything further that the prosecutor wanted to add to the plea agreement. Because the state district court found no evidence in the record from counsel addressing whether counsel informed Petitioner about restitution, the court assumed deficient performance, but it summarily dismissed this claim for lack of prejudice based upon the change-of-plea hearing transcript.

On appeal, the Idaho Court of Appeals agreed that the claim was without merit:

> Olsen's claim is belied by the record. At the change of plea hearing, the district court addressed restitution and the following exchange took place:

| | |
|---|---|
| THE COURT: | Is there anything about restitution for the victim or the victim's family in this matter? Was that part of the negotiations, or is that something that is going to be left open? |
| [COUNSEL]: | We haven't discussed that, Judge. |
| [PROSECUTOR]: | Judge, I think, by statute, that may become part of the proposed sentence– or the recommended sentence, I mean. But that's not part of what we have discussed. |
| THE COURT: | Do you agree that those are the terms of the plea bargain as outlined? |
| [PROSECUTOR]: | Yes, sir. |
| THE COURT: | Mr. Olsen, is that your understanding of the plea bargain? |

[OLSEN]:                Yes, Your Honor.

It is clear from this exchange that the district court addressed the prospect of restitution with the parties, and the prosecutor said that restitution was not something discussed as part of the plea agreement but acknowledged that restitution may become part of the proposed sentence. At that point, Olsen acknowledged that was his understanding of the agreement as well. The district court then went on to apprise Olsen of the potential maximum period of incarceration for the crime for which he would plead guilty, which Olsen also acknowledged that he understood. Because Olsen was fully advised of the potential consequences of his guilty plea to voluntary manslaughter, he did not suffer prejudice from trial counsel's alleged failure to fully advise him. Therefore, the district court did not err in summarily dismissing this claim of ineffective assistance of counsel.

(State's Lodging D-6, pp. 8-9.)

After the colloquy above, the sentencing court informed Petitioner of the possible sentences and fines, and made Petitioner aware that the court did not have to follow the recommendations of the parties, but it could impose the full penalties if it thought they were warranted. Restitution was not mentioned in the court's summary of penalties at the change-of-plea hearing. However, on the first day of the sentencing hearing, the parties indicated they had stipulated to a restitution amount of $9,018.46, and Petitioner indicated he had no objection and intended to pay the amount immediately. (State's Lodging C-5, pp. 9-10.) When Petitioner was sentenced on the third day of the sentencing hearing, the court indicated that the restitution amount had already been paid. (State's Lodging C-7, p. 814.)

*Strickland* governs the claim of ineffective assistance of counsel. In addition, the law is clearly established that, for a plea to be considered "voluntary," a prosecutor must keep the promises made in the plea bargaining process. *Santobello v. New York*, 404 U.S. 257 (1971). However, the *Santobello* Court limits the application of this proposition by confining it to "plea[s that] rest[ ] in any significant degree on a promise . . . of the prosecutor, so that it can be said to be part of the inducement or consideration." *Id*. at 262.

Petitioner first challenges the state courts' factual findings regarding whether the portion of the record cited really does reflect that Petitioner acknowledged that his understanding was that the plea agreement did not contain an agreement on restitution, but, by statute, the prosecutor could make a recommendation on restitution. The Court concludes that Petitioner has not offered clear and convincing evidence showing that the factfinding is unreasonable. The judge did not ask simply whether restitution was part of the plea agreement negotiations; rather, he clearly asked (1) whether it was part of the plea negotiations, *or* (2) "whether [it] is something that *is going to be left open*." (State's Lodging D-6, p. 9.)

The prosecutor clearly indicated restitution was not included in negotiations, which left only the other option–that it would be left open for the parties to argue and the judge to decide at sentencing. Petitioner is wrongfully assuming, without pointing to an adequate factual basis in the record, that anything left open after the plea agreement was necessarily closed, rather than left open–as the judge clearly stated. The decision might be

unreasonable had no mention of restitution been made before entry of the plea, or had the judge stated that if restitution was not a part of the plea agreement, that issue would be *closed*. However, when the court asked Petitioner if he understood exactly what the negotiations had included, Petitioner indicated he did understand. Petitioner did not dispute that restitution remained open. "Solemn declarations in open court carry a strong presumption of verity." *Blackledge v Allison*, 431 U.S. 63, 74 (1977).

In addition, even assuming for the sake of argument that Petitioner was under great emotional stress at the point in time when the colloquy took place and misunderstood the import of the judge's question and the prosecutor's response, the record does not support Petitioner's assertion under *Hill* that he would not have pleaded guilty had he known restitution was left open. Nothing in the record suggests that he came back–at any time between the entry of the plea and the time he stipulated to and paid the restitution amount before the last day of the sentencing hearing–to assert that he did not want to follow through with the plea agreement because of inclusion of the restitution in the sentence. Rather, as soon as he realized that restitution was left open, he agreed to pay the full amount, and, in fact, fully paid it, even before the sentence was pronounced (likely in an effort to positively influence the judge in sentencing). Based on the foregoing, the Court concludes that the Idaho Court of Appeals' decision is not based on an unreasonable determination of the facts from the evidence in the record.

The Court further concludes that the Idaho Court of Appeals' rejection of Petitioner's claim is not contrary to, or an unreasonable application, of *Strickland* or *Santobello*. The prosecutor broke no promise, Petitioner was placed on notice that the subject of restitution remained open at sentencing before Petitioner pleaded guilty, Petitioner agreed to and paid the restitution when he learned that issue was still open without complaint, and Petitioner suffered no prejudice from trial counsel's alleged failure to advise him of restitution. Accordingly, Petitioner is not entitled to habeas relief on Claim 7.

**6.      Discussion of Claim 10**

Claim 10 is that trial counsel were ineffective for coercing Petitioner into pleading guilty by telling him that he would likely receive a six-month sentence, but no more than seven years. Petitioner alleges he would not have pleaded guilty had he known he would receive so lengthy a sentence. He received a sentence of ten years fixed, with fifteen years indeterminate, for a total of twenty-five years, which is less than the thirty-year sentence he could have received.

The post-conviction court determined that counsels' performance was deficient because counsel had not specifically rebutted this allegation. However, the court determined that there was no prejudice, as the court had specifically asked Petitioner during the change-of-plea hearing if he understood that he faced up to thirty (30) years'

imprisonment for voluntary manslaughter, as enhanced for the use of a firearm, and

Petitioner had responded affirmatively. (State's Lodging C-4, p. 4.)

The Idaho Court of Appeals agreed with the state district court that because

Petitioner acknowledged that he understood the maximum possible sentence, he was not

prejudiced by counsel's predictions. (State's Lodging D-6, p. 9.)

In *Blackledge v. Allison*, 431 U.S. 63, 73-44 (1977), and *Santobello v. New York*,

404 U.S. at 260, the United States Supreme Court determined that whether promises were

made to a defendant and whether the promises were broken are components of the

voluntary and knowing nature of a guilty plea. In *Blackledge v. Allison*, it was alleged that

the defense attorney promised that Plaintiff would get a certain sentence (upon

representations to defendant that the attorney had consulted the prosecutor and judge

about the sentence) and that the defense attorney had instructed the defendant to answer

the questions in a manner so that the judge would accept the plea agreement, 431 U.S. at

69. In *Santobello*, the prosecutor promised not to make a sentencing recommendation, but

a new prosecutor took over the case and recommended the maximum sentence in an

inadvertent breach of the agreement. 404 U.S. at 259.

Here, in contrast, Petitioner does not allege that his attorney promised that

Petitioner would receive a certain sentence, only that his attorney made a prediction as to

the sentence he would receive, and that prediction turned out to be erroneous. Petitioner

argues that because he would not otherwise have pleaded guilty, the erroneous prediction

equals "coercion." The question before this Court is whether the advice Petitioner received from counsel was within the wide range of competence exhibited by attorneys in criminal cases. Because of the difficulties in evaluating attorney performance in hindsight, courts considering ineffective counsel claims must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

The United States Supreme Court has held that the validity of a guilty plea turns on "whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31 (1970). In *Hill*, the Court held that a plea is not knowing and voluntary if it was the result of defense counsel's advice amounting to ineffective assistance of counsel. *Id*. at 59. A plea is "knowing" if a defendant understands the federal constitutional rights he is waiving by pleading guilty, and it is "voluntary" if he "possesses an understanding of the law in relation to the facts." *Boykin v. Alabama*, 395 U.S. 238, 243 n.5 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 466 (1938)). Another definition of "voluntary and intelligent" is if the plea "represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *Alford*, 400 U.S. at 31.

Here, the colloquy makes it clear that Petitioner understood that, regardless of his counsels' prediction, the Court had authority to sentence Petitioner to the entire thirty-year maximum sentence (which, the Court specifically emphasized to Petitioner, would

last until Petitioner was 52 years old). (State's Lodging C-4, pp. 11-12.) Petitioner understood that the Court did not have to follow the recommendations for sentencing made by counsel. (*Id.*, pp. 4-5.) Petitioner clearly understood it was a prediction, and Petitioner clarified to the Court that no promises had been made to him to get him to plead guilty other than the reduction of the charge. (*Id.*, pp. 9-10.) In addition, though Petitioner has termed his claim "coercion," there is no evidence of coercion evident in the record, and Petitioner specifically answered at sentencing that no one had threatened him in order to get him to plead guilty. (*Id.*, p. 10.)

Petitioner also indicated at the change-of-plea hearing that he had made a voluntary and intelligent choice among the alternative courses of action open to the defendant. In response to whether he understood what an *Alford* plea was, Petitioner stated that his understanding was "that I don't agree with the charges but that I agree that there is strong enough evidence that possibly a jury might convict me of those charges, so I take the plea to take advantage of the plea bargain." (State's Lodging C-4, p. 7.) Again, the United States Supreme Court has noted that "[s]olemn declarations in open court carry a strong presumption of verity." *Blackledge v Allison*, 431 U.S. at 74.

Petitioner also argues that counsel made gross mischaracterizations to Petitioner about the sentence he would receive if he pleaded guilty. The Ninth Circuit Court has noted that an incorrect sentence prediction that amounts to "a gross characterization of the likely outcome . . . combined with the erroneous advice on the possible effects of going to

trial" would be enough to establish deficient performance under the *Strickland* standard. *Iaea v. Sunn*, 800 F.2d 861, 865 (9th Cir.1986). In *Iaea*, the attorney told the defendant that he had almost no chance of getting prison time (yet was sentenced to a life term), and that he could escape being subject to the minimum sentencing law only by pleading guilty, advice which was an incorrect statement of the law. *Id*. at 864-65.

Assuming that the prediction qualifies as a gross mischaracterization of what might occur if Petitioner pleaded guilty, the Court finds that Petitioner has pointed to no erroneous advice counsel gave Petitioner about the effects of going to trial that would combine to warrant a label of "deficient performance." Rather, counsel correctly informed Petitioner that going to trial had the risk that he might be convicted of second-degree murder, for which he could be sentenced to life in prison. As noted above, Petitioner himself stated at the change of plea hearing that he was entering an *Alford* plea because he understood the possibility of being convicted of second degree murder.

Petitioner knew that witnesses' testimony of a punch happening *before* he pulled out his weapon weakened his defense that he accidentally shot the gun *as* or *after* he was punched in the head. (State's Lodging C-2, p. 18-130.) While Petitioner had gained impeachment evidence about two witnesses that might have challenged their testimony about *when* the punch occurred, Petitioner's story that the victim could have simultaneously splashed beer in Petitioner's face, reached for a knife, and punched Petitioner in the head is internally inconsistent, as detailed in the Court's previous order

rejecting Petitioner's claim of actual innocence. (Dkt. 40.) It is also doubtful whether a jury would believe that the shots were a mistake, given that it is very difficult to shoot a large .45 pistol "by mistake" at all, let alone twice, as Petitioner's counsel worried. (State's Lodging C-2, pp. 181-82.)

Petitioner has not sufficiently shown erroneous advice about the effects of going to trial. Accordingly, the poor prediction alone, even if a gross mischaracterization, is not enough to show deficient performance. The Court must indulge the strong presumption that counsel's conduct was within the wide range of reasonable professional assistance, and not deficient.

Further, even if counsel's prediction was deficient performance, all of the evidence in the record regarding what Petitioner knew about the sentence recommendations and the maximum possible sentence shows that Petitioner was not prejudiced by the poor prediction. The plea agreement provided that the prosecutor would be limited to recommending a sentence of no more than fifteen years fixed plus five years indeterminate. (State's Lodging C-4, p. 3.) Petitioner acknowledged that he knew that the State's recommendation for twenty years' imprisonment was in the agreement. (State's Lodging C-2, pp. 131-32.) Therefore, Petitioner had to have realized that fifteen years fixed, and twenty years total, was a distinct possibility if the Court adopted the prosecutor's reasons for that recommendation.

In addition, the court advised Petitioner prior to his guilty plea that the penalty for manslaughter alone was fifteen years, and that, with the weapon enhancement, it increased to thirty years. (State's Lodging C-4, p.4.) The fact that the manslaughter charge was to be *enhanced* brought with it the probability of a greater penalty–that's what "enhancement" means. The state district court also carefully made sure that Petitioner understood that the court had not agreed to any particular sentence, and so there was no reason for Petitioner to rely so heavily on his counsel's prediction. (*Id.*, pp. 4-5.)

The Court concludes that Petitioner has shown neither deficient performance nor prejudice arising from the alleged prediction of the sentence by his counsel, whether under AEDPA's strict standards or on de novo review. As a result, Petitioner is not entitled to relief under Claim 10.

**7.    Discussion of Claims 14 & 15**

Claims 14 and 15 are that trial counsel were ineffective when they failed to file an appeal of his sentence (Claim 14) or his conviction (Claim 15). On post-conviction review, the court determined that Petitioner's version of events was not credible. On appeal, the Idaho Court of Appeals determined that the trial court's finding was supported by substantial evidence. (State's Lodging D-6, p. 13.) The Court of Appeals cited a letter counsel had written to Petitioner that set forth the relevant times for filing a direct appeal, a Rule 35 motion, and a post-conviction application. The record also contained several pages of trial counsel's notes of telephone conversations with Petitioner and his mother

regarding Rule 35 issues that supported the position that Petitioner had desired to file a Rule 35 motion. Based on the evidence in the record, the Idaho Court of Appeals concluded:

> The evidence supports the district court's conclusion that trial counsel consulted with Olsen regarding his rights of appeal and that he never requested that counsel file a direct appeal from his judgment of conviction. Therefore, Olsen has failed to meet his burden of proof and the district court did not err in dismissing this claim.

(State's Lodging D-6, p. 14.)

Petitioner argues that the record reflects that counsel recalled Petitioner asking after sentencing: "Can I appeal my sentence? What can I do to get a lower sentence. That kind of thing." (State's Lodging C-2, p. 211.) Counsel further testified:

> I remember Vince asking me about whether he should appeal his sentence. And I remember saying, "In my opinion, you have no valid basis for doing that. I would advise against it. I would advise you to file a Rule 35." And then Vince concurred in that.

(State's Lodging C-2, p. 215.) The Court noted that counsel had explained the *Toohill* sentencing criteria[2] to Petitioner, which supported counsel's opinion that an appeal of the sentence had no realistic expectation of success. (State's Lodging C-1, p. 159.)

"On conflicting evidence," the state district court "conclude[d] that Petitioner did not make a clear request to Manweiler to file an appeal from the judgment of conviction.

---

[2] In *State v. Toohill*, 650 P.2d 707 (Idaho Ct. App.1982), the court noted that when considering whether a sentence is reasonable, the court is to consider the factors of protection of society, retribution, deterrence, and rehabilitation. Under *Toohill*, a sentence longer than necessary to achieve these sentencing goals constitutes an abuse of discretion.

Rather, he deferred to Manweiler's professional judgment, electing to pursue the motion for reduction of sentence." (*Id.*, p. 159.) The state courts found no evidence that this advice was deficient. (*Id.*)

This is much like the issue of the withdrawal of the guilty plea, discussed earlier in this Order: there was a discussion about direct appeal, but Petitioner never expressly requested counsel to file a direct appeal. Here, Petitioner agreed that a Rule 35 motion was a better course of action, on his attorneys' advice.

This Court concludes that Petitioner has not met his burden to show that the state courts unreasonably determined the facts. The state district court made a particular point in the decision to note that Petitioner generally was not a credible witness:

> Apart from impressions formed from observation of Petitioner during his testimony, the Court could recite at length factual considerations which have led to the conclusion that Petitioner was not a credible reporter of facts relating to his interaction with trial counsel. The Court has elected not to do so. The litany of the reasons for the conclusions would almost certainly fail to include facts which have led to the ultimate factual finding that Petitioner is not credible.

(State's Lodging C-1, p. 156 n.1.)

The Court further concludes that Petitioner has not met his burden to show that the state court decisions are an unreasonable application of *Strickland*. Petitioner has shown neither deficient performance nor prejudice. As a result, habeas corpus relief on Claims 14 and 15 is unwarranted.

**8.    Discussion of Claim 20**

Claim 20 is that counsel performed ineffectively when Petitioner asked his attorneys to file a change of venue, due to extensive negative pretrial publicity, but his counsel did not request a change of venue. Petitioner provided to the state courts a variety of newspaper and Internet articles to support his claim. Some of the headlines include the following: "Senate majority leader's son shot at Boise party," "Lawmaker's son slain at party," BSU student charged in slaying," "Lawyer: Shooting was self-defense," "Shooter claims self-defense," "Senate plans day off for funeral," "Governor, first lady among mourners at Davis funeral," "Both houses mourn Davis," "Back to work after a day off for funeral," "Davis welcomed back to Idaho Senate,""and "Student pleads not guilty to murder charges." (State's Lodging C-9.)

The state district court determined that the claim was subject to summary dismissal for Petitioner's failure to provide evidence of prevailing professional norms for requesting changes of venue, which goes to the deficient performance prong of *Strickland*. (*Id.*) The state district court reviewed the newspaper articles and determined that a request for change of venue would have been denied for lack of sufficient publicity, which goes to the prejudice prong of *Strickland*. (State's Lodging D-6, p. 4.) The Idaho Court of Appeals agreed, noting that "[w]hether a change of venue should be requested is a matter of trial strategy and tactical choice, not subject to review as a claim of ineffective

assistance of counsel in the absence of proof of inadequate preparation or ignorance on counsel's part." (State's Lodging D-6, p.4.)

Having reviewed the news stories and the affidavit of Petitioner's trial counsel stating that he believed there was insufficient publicity to warrant a change in venue, the Idaho Court of Appeals concluded that the decision was a tactical decision and a matter of trial strategy, which the Court would "not second-guess." (*Id.*)

*Strickland* governs the question of whether Petitioner's counsel should have requested a change of venue. In addition, the standard required for a change of venue is very high. In *Murphy v. Florida*, 421 U.S. 794, 798 (1975), the court held that a change of venue is required only where the defendant shows that the pretrial publicity has been so extreme as to cause actual prejudice or that the media coverage had "utterly corrupted" the trial.

In *Irvin v. Dowd*, 366 U.S. 717, 721 (1961), the Court explained the standard for determining juror bias as follows:

> It is not required . . . that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

366 U.S. at 724-25 (internal quotation marks and internal citations omitted). In *Irvin*, the Court concluded that the jury was not impartial, as eight of the twelve jurors had formed an opinion that the defendant was guilty before the trial began, and some of those had said that it would take evidence to overcome their belief in his guilt. 366 U.S. at 728.

In *Dobbert v. Florida*, 432 U.S. 282, 303 (1977), a case in which a father was charged with murdering two of his children and torturing and abusing his two remaining children, the Court further explained the *Murphy* standard as follows:

> Under *Murphy*, extensive knowledge in the community of either the crimes or the putative criminal is not sufficient by itself to render a trial constitutionally unfair. Petitioner in this case has simply shown that the community was made well aware of the charges against him and asks us on that basis to presume unfairness of constitutional magnitude at his trial. This we will not do in the absence of a "trial atmosphere . . . utterly corrupted by press coverage," *Murphy v. Florida, supra*, 421 U.S., at 798, 95 S.Ct., at 2035.

In *Murphy*, the Court made it clear that its prior precedent[3] could not be read to stand for the proposition that "juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process." 421 U.S. at 799. Rather, the Court noted that resolution required a reviewing court to determine whether there were "any indications in the totality of circumstances that petitioner's trial was not fundamentally fair." *Id*.

---

[3]*Rideau v. Louisiana*, 373 U.S. 723 (1963), *Estes v. Texas*, 381 U.S. 532 (1965), and *Sheppard v. Maxwell*, 384 U.S. 333 (1966).

For example, in *Murphy*, the Court indicated that it may be appropriate for a reviewing court to compare the number of venire persons who admitted prejudice to the total number of venire persons to determine whether the opinions of those persons indicating that they were not biased should be trusted:

> The length to which the trial court must go in order to select jurors who appear to be impartial is another factor relevant in evaluating those jurors' assurances of impartiality. In a community where most veniremen will admit to a disqualifying prejudice, the reliability of the others' protestations may be drawn into question; for it is then more probable that they are part of a community deeply hostile to the accused, and more likely that they may unwittingly have been influenced by it. In *Irvin v. Dowd*, for example, the Court noted that 90% of those examined on the point were inclined to believe in the accused's guilt, and the court had excused for this cause 268 of the 430 veniremen. In the present case, by contrast, 20 of the 78 persons questioned were excused because they indicated an opinion as to petitioner's guilt. This may indeed be 20 more than would occur in the trial of a totally obscure person, but it by no means suggests a community with sentiment so pointed against petitioner as to impeach the indifference of jurors who displayed no animus of their own.

421 U.S. at 802-03.

With these principles in mind, the Court now turns to the facts of this case. While Petitioner has provided media articles about the incident, including those focused on the fact that the victim was from a prominent family and that the state legislature took a day off for the victim's funeral, the record contains no evidence that the publicity in his case adversely affected the jury pool, which goes to the issue of prejudice. Neither is there any evidence showing under what circumstances Idaho lawyers decide to request a change of venue for their criminal clients, which goes to the issue of deficient performance. Given

the difficulty of showing not only that a fair number of jurors have formed opinions, but that they cannot lay those opinions aside, and that the trial atmosphere was utterly corrupted by press coverage, Petitioner has not met his burden to show that his attorney erred (regardless of whether it was a true "tactical" or "strategic" decision), that prejudice resulted, that the state court factual finding was unreasonable, or that the decision of the Idaho Court of Appeals was contrary to, or an unreasonable application of, *Strickland* or the case law governing change of venue, as cited above. Accordingly, Claim 20 will be denied.

**9.    Claim 32**

Claim 32 is that because Petitioner's written judgment and sentence refer to his conviction as "voluntary manslaughter with a deadly weapon," his sentence is illegal under Idaho law. Petitioner argues that he has been convicted and sentenced for a crime that doesn't exist in the statutes. This Court rejects this claim, agreeing with Respondent that, any way the claim is viewed on habeas review, it is without merit.

At the change-of-plea hearing, the state district court explained:

I find that Mr. Olsen is aware of what his rights are;

He is aware of the potential consequences of the plea;

He has a knowing understanding of the potential consequences, that is, potentially thirty years in the State Penitentiary and a potential fine of up to $15,000; and

That is has made a voluntary, knowing, and intelligent plea to the charge of voluntary manslaughter with use of a deadly weapon.

It is important to note that the deadly weapon is merely an enhancement of the initial charge for sentencing purposes.

And so I will refer to the offense, probably both now and at sentencing, as a voluntary manslaughter with a deadly weapon, as opposed to two separate counts, because they are really one offense in that sense. It is merely a sentencing enhancement.

(State's Lodging C-4, pp. 12-13.)

The Idaho Court of Appeals determined that whether the state district court referred to the sentence as one for voluntary manslaughter with a deadly weapon or for voluntary manslaughter with an enhancement for use of a firearm in the commission of a felony made no difference. (State's Lodging F-4, pp. 2-3.) Petitioner was sentenced to twenty-five years, which was in the range of sentencing for the manslaughter charge with the firearms enhancement.

"Upon valid conviction and sentencing of a defendant, due process having been provided, the state may deprive the defendant of his liberty for the term of the sentence pronounced by the district judge." *State v. Coassolo*, 30 P.3d 293, 298 (Idaho 2001), citing *Greenholtz v. Inmates of the Neb. Penal and Corr. Complex*, 442 U.S. 1, 7 (1979) (citations omitted). The question here is whether Petitioner's conviction and sentence were valid.

Petitioner provides no evidence to show that anyone, including he himself, was ever confused about what he pleaded guilty to or what he was sentenced for. At the change-of-plea hearing, the judge very clearly notified Petitioner of the separate penalties

for each, and placed Petitioner on notice that he would be using a "shorthand" version of the crime and the enhancement when speaking of both, and that he would be using the shorter version at the change-of-plea hearing at and sentencing, as set forth above.

Respondent is correct in arguing that Petitioner relies upon state, not federal, law for the proposition that a district court must separately pronounce each segment of a sentence enhanced under Idaho Code § 19-2520. While that was a state-law requirement between 1994 and 2007, as provided in Idaho case law, Petitioner has pointed to no United States Supreme Court precedent so requiring. "Federal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *see also Peltier v. Wright*, 15 F.3d 860, 861-62 (9th Cir. 1994) (noting that generally federal habeas corpus is unavailable for alleged errors in interpretation and application of state law).

Accordingly, Petitioner's claim is denied because the Idaho Court of Appeals' decision is not an unreasonable determination of facts, because the decision is not contrary to federal due process principles, and, alternatively, because it is a non-cognizable state-law claim. This concludes the Court's review of Petitioner's claims on the merits, and, as a result, the Petition will be denied and dismissed with prejudice.

## CERTIFICATE OF APPEALABILITY

In the event Petitioner files a notice of appeal from the Order and Judgment in this case, and in the interest of conserving time and resources, the Court now evaluates the

claims within the Petition for suitability for issuance of a certificate of appealability (COA), which is required before a habeas corpus appeal can proceed. 28 U.S.C. § 2253(c)(1)(A); *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); Rule 11(a), Rules Governing Section 2254 Cases.

A COA will issue only when a petitioner has made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Supreme Court has explained that, under this standard, a petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal citation and punctuation omitted).

When a court has dismissed a petition or claim on procedural grounds, in addition to showing that the petition "states a valid claim of the denial of a constitutional right," as explained above, the petitioner must also show that reasonable jurists would find debatable whether the court was correct in its procedural ruling. *Slack,* 529 U.S. at 484. When a court has dismissed the petition or claim on the merits, the petitioner must show that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* at 484. The COA standard "requires an overview of the claims in the habeas petition and a general assessment of their merits," but a court need not determine that the petitioner would prevail on appeal. *Miller-El*, 537 U.S. at 336.

Here, the Court has dismissed Petitioner's claims on procedural grounds, and some have been alternatively denied on the merits. The Court finds that additional briefing on the COA is not necessary. Having reviewed the record again, the Court concludes that reasonable jurists would not find debatable the Court's decision on the procedural issues and the merits of the claims raised in the Petition and that the issues presented are not adequate to deserve encouragement to proceed further. As a result, the Court declines to grant a COA on any issue or claim in this action.

If he wishes to proceed to the United States Court of Appeals for the Ninth Circuit, Petitioner may file a notice of appeal in this Court, and simultaneously file a motion for COA in the Ninth Circuit Court of Appeals, pursuant to Federal Rule of Appellate Procedure 22(b), **within thirty (30) days after entry of this Order**.

## ORDER

**IT IS ORDERED:**

1. Respondent's Motion for Summary Judgment (Dkt. 42) is GRANTED. Petitioner's case is DISMISSED with prejudice.

2. The Court will not grant a Certificate of Appealability in this case. If Petitioner chooses to file a notice of appeal, the Clerk of Court is ordered to forward a copy of this Order, the record in this case, and Petitioner's notice of appeal, to the United States Court of Appeals for the Ninth Circuit.

DATED: **March 30, 2011**

Honorable Edward J. Lodge
U. S. District Judge